**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 8, 2010

STATE OF MICHIGAN

SUPREME COURT

INSURANCE INSTITUTE OF
MICHIGAN, HASTINGS MUTUAL
INSURANCE COMPANY, FARM
BUREAU GENERAL INSURANCE
COMPANY, FRANKENMUTH
CASUALTY INSURANCE, WALTER
STAFFORD, JR., and MICHAEL FLOHR,

   Plaintiffs-Appellees,

and

MICHIGAN INSURANCE COALITION
and CITIZENS INSURANCE COMPANY
OF AMERICA,

   Intervening Plaintiffs-
   Appellees,

v             No. 137400

COMMISSIONER, FINANCIAL &
INSURANCE SERVICES, DEPARTMENT
OF LABOR & ECONOMIC GROWTH,

   Defendant-Appellant.

_____

INSURANCE INSTITUTE OF
MICHIGAN, HASTINGS MUTUAL
INSURANCE COMPANY, FARM

BUREAU GENERAL INSURANCE
COMPANY, FRANKENMUTH
CASUALTY INSURANCE, WALTER
STAFFORD, JR., and MICHAEL FLOHR,

   Plaintiffs-Appellants,

and

MICHIGAN INSURANCE COALITION
and CITIZENS INSURANCE COMPANY
OF AMERICA,

   Intervening Plaintiffs-
   Appellants,

v            No. 137407

COMMISSIONER, FINANCIAL &
INSURANCE SERVICES, DEPARTMENT
OF LABOR & ECONOMIC GROWTH,

   Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

This case concerns the validity of rules promulgated by defendant Commissioner of Financial & Insurance Services (the OFIS rules)[1] banning the practice of "insurance scoring" under Chapters 21, 24, and 26 of the Insurance Code. The trial court ruled that

---

[1] On February 1, 2008, Governor Jennifer Granholm signed Executive Order 2008-01, which reorganized the Office of Financial & Insurance Services (OFIS) and changed its name to the Office of Financial & Insurance Regulation (OFIR). The order took effect April 6, 2008. <http://www.michigan.gov/dleg/0,1607,7-154-10555---,00.html> (accessed June 21, 2010.) We use the former name in order to maintain consistency with the parties' briefs and the Court of Appeals opinions.

2

the rules were "illegal, invalid, and unenforceable" and permanently enjoined defendant from enforcing them. The Court of Appeals issued three separate opinions, which vacated the circuit court's order but did not agree on a rationale. We hold that the Commissioner exceeded her authority by promulgating the OFIS rules because they are contrary to the Insurance Code. Accordingly, we vacate the judgment of the Court of Appeals and reinstate the trial court's order.

## I. FACTS AND PROCEEDINGS

As explained in a 2002 report from then-OFIS Commissioner Frank Fitzgerald, "insurance scoring" or "insurance credit scoring" is "the use of select credit information to help insurance companies establish automobile and homeowners premiums." Frank Fitzgerald, The Use of Credit Scoring in Automobile and Homeowners Insurance (2002) (Fitzgerald Report),[2] p 5. An individual's credit score is calculated by applying a standard formula to information from the individual's credit history. These formulas are developed either by the insurance companies themselves or by credit scoring companies. *Id*. Insurance companies that use insurance scoring offer discounts to individuals with good insurance scores. Not all insurance companies use insurance scoring. Of those that do, their practices vary concerning the extent of the discounts offered and how the insurance scores are calculated. *Id*. at 5-6.

---

[2] Available at <http://www.michigan.gov/documents/cis_ofis_credit_scoring_report_52885_7.pdf> (accessed June 21, 2010).

3

In 1997, the Legislature enacted MCL 500.2110a, which allows insurers to establish and maintain a premium discount plan without prior approval by the Legislature or the insurance commissioner. As a result, insurance companies in Michigan began using insurance scoring. Fitzgerald Report, *supra* at 9. In 2002, Commissioner Fitzgerald undertook a statewide study of this practice in order "to gather information on the use of insurance credit scoring in personal automobile and homeowners insurance policies and to take testimony concerning its effect on Michigan citizens." *Id*. at 1. In December 2002, OFIS issued the Fitzgerald Report, which concluded that "Michigan law permits a discount based on insurance credit scoring" but that "significant and legitimate concerns" identified during the course of the study "must be addressed to adequately protect the rights of Michigan consumers under the Insurance Code." *Id*. at 24. To address these concerns, the report included several "Administrative Recommendations," or "action[s] that [are] available to the commissioner under current law." *Id*. The report concluded that "[o]ther concerns are beyond the statutory authority of the commissioner to remedy and will require action by the Michigan Legislature." *Id*. The report thus "respectfully submitted" several "Legislative Recommendations" "for the consideration of legislators in their policy deliberations." *Id*. None of the legislative recommendations totally prohibited the use of insurance scoring.

On February 14, 2003, Commissioner Fitzgerald issued a bulletin setting forth several directives taken from the December 2002 report. *In the Matter of Conforming Insurance Credit Scoring Practices With Insurance Code Requirements*, OFIS Bulletin

4

2003-01-INS (February 14, 2003).[3] On the same date, he issued an order directing OFIS staff to monitor insurance companies' compliance with the directives and to initiate compliance actions as appropriate. *Order to Monitor Insurer Practices and To Initiate Compliance Actions as Appropriate*, OFIS Order No. 03-005-M (February 14, 2003).[4] The bulletin directed insurance companies using insurance scoring to file with OFIS such information as "the formula used to apply the discount," "the specific credit classification factors used to calculate the insurance credit score," and an annual "actuarial certification justifying the discount levels and discount tiers offered by the company." OFIS Bulletin, *supra*. The bulletin also directed insurance companies to "recalculate and then apply an insured's insurance credit score at least once annually" and to "annually inform . . . policyholders or applicants of the credit score used to apply an insurance credit scoring discount . . . ." *Id.*

On May 13, 2003, then-OFIS Commissioner Linda A. Watters[5] issued an "update" to her predecessor's February 14, 2003 bulletin. *In the Matter of Insurance Credit Scoring Practices—Update to Bulletin 2003-01-INS*, OFIS Bulletin 2003-02-INS (May

---

[3] Available at <http://www.michigan.gov/dleg/0,1607,7-154-10555_12900_12906-61601--,00.html> (accessed June 21, 2010).

[4] Available at <http://www.michigan.gov/documents/cis_ofis_03_005_m_57777_7.pdf> (accessed June 21, 2010).

[5] The current OFIR Commissioner is Ken Ross. <http://www.michigan.gov/dleg/0,1607,7-154-10555-32386--,00.html> (accessed June 21, 2010).

13, 2003) (Watters Bulletin).[6] The bulletin began by stating that "[i]nsurance scoring is problematic at best. Perhaps no other widespread practice of insurers presents so many technical and social issues." After providing several examples, the bulletin continued:

> Such considerations led Governor Granholm to call for a ban on the use of insurance credit scoring altogether. In February, two bills were introduced that would ban the use of insurance credit scoring in the rating of automobile and home insurance. . . .

> If a ban cannot be achieved, at least significant reform legislation is imperative to protect the interests of consumers on such an important matter as the amount they pay for automobile and home insurance. This agency will be fully supportive of the Governor in these matters.

> In the meantime, it is incumbent upon the Commissioner to make the most of current law in addressing the concerns above. Bulletin 2003-01-INS was designed to conform insurance credit scoring practices to Insurance Code requirements.

The bulletin also reiterated that insurers must inform policyholders or applicants of the credit score used to apply a discount and revised the directive requiring annual recalculation of insurance scores to require recalculation only upon the request of the insured. *Id.*

In July 2004, after neither of the above-mentioned bills was enacted into law, OFIS developed proposed administrative rules prohibiting the use of insurance scoring. It held four public hearings—in Lansing, Detroit, Grand Rapids, and Flint—"to receive public comments on proposed rules clarifying a reasonable classification system under the Insurance Code, by requiring insurers to adjust base rates and by prohibiting the use

---

[6] Available at <http://www.michigan.gov/dleg/0,1607,7-154-10555_12900_12906-75302--,00.html> (accessed June 21, 2010).

6

as a rating factor after January 1, 2005, of a credit-based insurance score." See OFIS Notice of Public Hearing on Proposed Rules to Reduce Insurance Base Rates and To Ban the Use of Credit Scoring.[7]

After submission to and approval by the Office of Regulatory Reform,[8] the Commissioner formally adopted the rules. See MCL 24.245. On February 17, 2005, the Joint Committee on Administrative Rules (JCAR)[9] issued a notice of objection to the proposed rules. See MCL 24.245a.[10] JCAR determined that "[t]he agency is exceeding the statutory scope of its rule-making authority" and that "[t]he rule is in conflict with state law, the Insurance Code of 1956," and "is arbitrary or capricious." JCAR Revised Notice of Objection, # 05-3 (February 17, 2005). Bills to rescind the OFIS rules upon their effective date were introduced in both the House and Senate on February 22, 2005. SB 233; HB 4374. See MCL 24.245a(3).[11] After Governor Granholm indicated her

---

[7] Available at <http://www.michigan.gov/documents/2004-022_newspaper_hrg_notice_94059_7.pdf> (accessed June 21, 2010).

[8] The Office of Regulatory Reform has now been restructured and renamed the State Office of Administrative Hearings and Rules. <http://www.michigan.gov/dleg/0,1607,7-154-10576_35738-15543--,00.html> (accessed June 21, 2010).

[9] According to the website of the Michigan Legislative Council, JCAR "is a statutorily created bipartisan legislative committee, comprised of 5 house and 5 senate members, which is responsible for the legislative oversight of administrative rules proposed by state agencies." <http://council.legislature.mi.gov/jcar.html> (accessed June 21, 2010).

[10] Pursuant to MCL 24.245a(1), JCAR has 15 days after receipt to consider a proposed rule and to object by filing a notice of objection.

[11] MCL 24.245a(3) provides, in relevant part:

7

intention to veto these bills, however, Senator Mike Bishop stated during a March 9, 2005 session of the Senate that "it would be futile for us to take up these bills and pointless to pursue passage of Senate Bill No. 233." Statement of Senator Bishop, Journal of the Senate, March 9, 2005, pp 247-248. No legislative action ensued.

Under MCL 24.245a(5),[12] ORR filed the rules with the Secretary of State on March 25, 2005. On March 29, 2005, plaintiffs filed a complaint for declaratory and injunctive relief, and the Michigan Insurance Coalition and Citizens Insurance Company of America filed a complaint and a motion to intervene as plaintiffs.[13] Plaintiffs and

_____

If the committee files a notice of objection within the time period prescribed in subsection (1), the committee chair, the alternate chair, or any member of the committee shall cause bills to be introduced in both houses of the legislature simultaneously. Each house shall place the bill or bills directly on its calendar. The bills shall contain 1 or more of the following:

(a) A rescission of a rule upon its effective date.

[12] MCL 24.245a(5) provides:

If the legislation introduced pursuant to subsection (3) is defeated in either house and if the vote by which the legislation failed to pass is not reconsidered in compliance with the rules of that house, or if legislation introduced pursuant to subsection (3) is not adopted by both houses within the time period specified in subsection (4), the office of regulatory reform may file the rule with the secretary of state. The rule shall take effect immediately upon filing with the secretary of state unless a later date is specified within the rule.

[13] According to plaintiffs' brief in Docket No. 137407, p 1 n 4, plaintiff Insurance Institute of Michigan "is a trade association comprised of 38 property and casualty insurance companies," including plaintiffs Hastings Mutual Insurance Company (Hastings), Farm Bureau General Insurance Company of Michigan (Farm Bureau), and Frankenmuth Casualty Insurance (Frankenmuth). "Plaintiffs Walter Stafford, Jr. and Michael Flohr are policyholders of Farm Bureau whose insurance premiums would be increased by the OFIS rules." *Id*. Intervening plaintiff Michigan Insurance Coalition "is

proposed intervening plaintiffs also sought a preliminary injunction. The parties subsequently stipulated to the intervention of the proposed intervening plaintiffs as plaintiffs.

Defendant moved for a change of venue and also argued that plaintiffs were not permitted to bring an original action in the circuit court, but were limited to filing a petition for judicial review under MCL 500.244(1). On April 15, 2005, the trial court heard arguments on both defendant's motion and on the merits of the case. It denied defendant's motion for a change of venue. At the close of plaintiffs' arguments on the merits, defense counsel declined to present any additional testimony or evidence, stating the defense position that review should be limited to the administrative record.[14] The court then stated it would "consolidate this hearing with the final trial."

---

a property-casualty trade association based in Michigan" and intervening plaintiff Citizens Insurance Company of America (Citizens) "is a property and casualty company based in Michigan." *Id*. at 2 n 4.

[14] The following exchange took place on the record:

*The Court*: Okay, let me just ask [defense counsel].

My understanding is that you do not wish to present any additional testimony or evidence at this hearing today. Is that correct?

[*Defense Counsel*]: That's correct.

*The Court*: Or – or in the case itself. Is that true?

[*Defense Counsel*]: It's our position that the scope of judicial review is limited to making a decision whether the Commissioner was arbitrary and capricious based on the record that we filed with the court.

In its opinion and order issued April 25, 2005, the trial court concluded that the OFIS rules were "illegal, invalid, and unenforceable," and permanently enjoined the Commissioner from enforcing them. The court "decline[d] to review the record of the public hearings for the reason that it consists largely of position statements and opinions which may not be admissible under the rules of evidence, and more importantly because the [c]ourt [found] it unnecessary to address whether the rules are arbitrary and capricious . . . ." *Id*. at 3. Rather, it viewed the dispositive issue as "the legality of the Defendant's rules, given the Commissioner's rule-making authority." *Id*. It concluded that the Commissioner had exceeded her authority in promulgating the rules by ordering an industry-wide reduction in rates rather than challenging rates on an individual basis through the contested case hearing process set forth in the Insurance Code. *Id*. at 4. The court also concluded that the rules' "blanket prohibition" on rating plans using insurance scoring violated the Insurance Code because the evidence established a correlation between insurance scores and risk of loss, and the Commissioner lacks the authority to ban rating plans that meet the requirements of the Code. *Id*. at 5.

---

*The Court*: Okay. And the Plaintiffs – with that understanding, my further understanding is the Plaintiffs do not intend to present any further evidence or testimony either today or at any subsequent trial?

[*Intervening Plaintiffs' Counsel*]: As – if they are not permitted to introduce the administrative record, that's true. If your Honor is going to consider all of the paperwork that they filed at four o'clock or so yesterday afternoon, then my answer is different. [Tr., April 15, 2005, pp 47-49.]

10

Defendant appealed. On August 21, 2008, the Court of Appeals issued three separate opinions. *Ins Institute of Mich v Comm'r of the Office of Fin & Ins Servs*, 280 Mich App 333; 761 NW2d 184 (2008). Judge WHITE voted to vacate the trial court's judgment in part because the court had erred by failing to base its review on the administrative record, by accepting additional evidence, and in part on the merits. *Id*. at 343-365. Judge K. F. KELLY also thought that the trial court's order should be vacated, but for a different reason: namely, because the court had erred by permitting plaintiffs to maintain an original action. *Id*. at 379-382. Judge ZAHRA dissented from the decision to vacate the trial court's order. He concluded that the court had properly allowed plaintiffs to bring an original action. *Id*. at 366-372. Although he agreed with Judge WHITE that the court had erred by failing to base its review on the administrative record, he concluded that the error was harmless "because the issue resolved by the lower court was a purely legal question[.]" *Id*. at 366. Judge ZAHRA agreed with the trial court that the rules were illegal and invalid because the Commissioner exceeded her authority in promulgating them. *Id*. at 373-379.

In February 2009, despite pending applications for leave to appeal in this Court, defendant began issuing notices that disapproved new rate filings. At least some of the notices acknowledged the trial court's order enjoining enforcement of the OFIS rules, but they stated that the Commissioner's disapproval of the particular rate filing was "based on the conclusion that insurance scoring is directly prohibited by the Insurance Code because rates based on insurance scoring are unfairly discriminatory and not in reliance on the enjoined administrative rules." As a result of the Commissioner's issuance of

11

these notices, plaintiffs moved in the trial court to enforce the court's April 25, 2005 order. On April 10, 2009, the court issued an order granting plaintiffs' motion and precluding defendant from "challenging or denying rate filings on the basis that the rate filing uses insurance scores as a rating factor." The order further provided that defendant's notices were "VOID and RESCINDED as violative of this Court's prior injunction" and ordered the Commissioner to "REFRAIN from taking further action based on a blanket prohibition on the use of insurance scores."

Both parties filed applications for leave to appeal. By order of May 7, 2009, we granted leave to resolve the various procedural and substantive issues in this case. *Ins Institute of Mich v Comm'r Fin & Ins Servs*, 483 Mich 1000 (2009).

## II. JUDICIAL REVIEW OF AGENCY RULEMAKING

The first set of issues before us concerns defendant's claim that the trial court erred by permitting plaintiffs to maintain an original declaratory judgment action. Defendant argues that, under § 64 of the Administrative Procedures Act (APA), MCL 24.201 *et seq*., plaintiffs were not permitted to bring an original declaratory judgment action in the trial court without having first requested a declaratory ruling from the OFIS. Defendant also argues that MCL 500.244(1) provides the exclusive means of seeking judicial review of rules promulgated by the Commissioner and that, under that provision, as well as this Court's decision in *Mich Ass'n of Home Builders v Dep't of Labor & Economic Growth Dir*, 481 Mich 496; 750 NW2d 593 (2008), judicial review of administrative rules is limited to the "administrative record," i.e., the record compiled during the rulemaking process.

12

We decline to reach these issues because it is unnecessary for us to do so. Defendant has expressly waived any error concerning the procedural issues by arguing that a remand to the trial court is unnecessary and asking this Court to reach the substantive issues in this case.[15] Moreover, even if the trial court erred by not limiting its review to the administrative record, the error was harmless because there is ample evidence in that record to support the trial court's conclusion that insurance scoring is permissible under the Insurance Code.[16]

---

[15] Defendant states:

> Although this case was erroneously commenced as an original action under [chapter 3] of the APA, remand to the lower courts would unnecessarily delay a final resolution in a case[] that was filed in March 2005. Judicial review is proper under MCL 500.244(1) based on the agency record, which is before this Court. [Defendant's Brief in Docket No. 137400, p 50.]

In addition, defense counsel stated at oral argument that he wanted the Court to decide the substantive issue in this case. Oral Argument Transcript at 5, 37-38.

[16] We reject the dissent's assertion that we err by not confining our review to the administrative record "to conform to [our] 'harmless error' analysis." We conclude that *even if* the trial court erred by not limiting its review to the administrative record, the error was harmless because there is ample evidence in that record to support the trial court's conclusion that insurance scoring is permissible under the Insurance Code. Thus, we do not decide whether the trial court properly reviewed the circuit court record or whether it should have limited its review to the administrative record. We conclude that ample evidence on either record supports the trial court's conclusion.

13

III. VALIDITY OF THE RULES UNDER THE INSURANCE CODE

A. STANDARD OF REVIEW

This case presents the legal question of the validity of the OFIS rules under the Insurance Code. In *Luttrell v Dep't of Corrections*, 421 Mich 93, 100; 365 NW2d 74 (1984), we adopted the test for judicial review of agency rules articulated by the Court of Appeals in *Chesapeake & Ohio R Co v Pub Serv Comm*, 59 Mich App 88, 98-99; 228 NW2d 843 (1975):

> "Where an agency is empowered to make rules, courts employ a three-fold test to determine the validity of the rules it promulgates: (1) whether the rule is within the matter covered by the enabling statute; (2) if so, whether it complies with the underlying legislative intent; and (3) if it meets the first two requirements, when *[sic]* it is neither arbitrary nor capricious."

An agency's construction of a statute "is entitled to respectful consideration and, if persuasive, should not be overruled without cogent reasons," but "the court's ultimate concern is a proper construction of the plain language of the statute." *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 108; 754 NW2d 259 (2008). "[T]he agency's interpretation cannot conflict with the plain meaning of the statute." *Id*.

As discussed in section III(D) of this opinion, we conclude that the Commissioner exceeded her authority in promulgating the OFIS rules. The rules purport to prohibit a practice—insurance scoring—that is permissible under the Insurance Code. Accordingly,

14

the OFIS rules are not "within the matter covered by the enabling statute." *Luttrell*, 421 Mich at 100 (citation and quotation marks omitted).[17]

## B. THE INSURANCE CODE

The OFIS rules apply to "personal insurance," which they define as "private passenger automobile, homeowners, motorcycle, boat, personal watercraft, snowmobile, recreational vehicle, mobile-homeowners and non-commercial dwelling fire insurance policies" that are "underwritten on an individual or group basis for personal, family, or household use." Mich Admin Code, R 500.2151(2).

Accordingly, three chapters of the Insurance Code are relevant here: Chapter 21, which applies to individual automobile and home insurance; Chapter 24, which applies to group automobile and home insurance as well as personal lines covering mobile homes, rental properties, recreational vehicles, motorcycles, and boats; and Chapter 26, which applies to group home insurance and the other personal property lines to which Chapter 24 also applies. MCL 500.2105; MCL 500.2401; MCL 500.2601; OFIS Report to JCAR (October 1, 2004), p 2.

Under all three chapters, the insurers, rather than the Commissioner or OFIS, formulate the plans they use to establish insurance rates. In formulating rating plans

---

[17] We reject the dissent's assertion that we improperly shift the burden to defendant. As thoroughly discussed in this opinion, plaintiffs have established that insurance scoring may be used to establish and maintain a premium discount plan that complies with Chapter 21, and that it may be used as a rating factor consistently with the requirements of Chapter 24 and 26. Thus, plaintiffs have established that the OFIS ban on insurance scoring is not "within the matter covered by" the Insurance Code because insurance scoring is permissible under the plain language of the code.

under Chapters 24 and 26, "[d]ue consideration shall be given to past and prospective loss experience . . . and to all other relevant factors within and outside this state." MCL 500.2403(1)(a); MCL 500.2603(1)(a). "Risks may be grouped by classifications for the establishment of rates and minimum premiums," and "[t]he rating plans may measure any differences among risks that may have a probable effect upon losses or expenses . . . ." MCL 500.2403(1)(c); MCL 500.2603(1)(c). "Rates shall not be excessive, inadequate, or unfairly discriminatory." MCL 500.2403(d); MCL 500.2603(d).

For home and automobile insurance under Chapter 21, classifications must be "based only upon 1 or more" of the factors set forth in MCL 500.2111. MCL 500.2111(2). These factors include such things as the age of the driver, average weekly or annual mileage, and amount of insurance. In addition, MCL 500.2110a permits insurers to "establish and maintain a premium discount plan utilizing factors in addition to those permitted by section 2111," provided that "the plan is consistent with the purposes of this act and reflects reasonably anticipated reductions in losses or expenses" and the insurer applies the plan uniformly to all its insureds. Rates under Chapter 21, like those established under Chapters 24 and 26, "shall not be excessive, inadequate, or unfairly discriminatory." MCL 500.2109(1)(a).

The Commissioner derives her rulemaking authority from MCL 500.210, which provides:

> The commissioner shall promulgate rules and regulations in addition to those now specifically provided for by statute as he may deem necessary to effectuate the purposes and to execute and enforce the provisions of the

16

insurance laws of this state in accordance with the provisions of [the APA].[18]

In addition, MCL 500.2484 (Chapter 24) and MCL 500.2674 (Chapter 26) provide: "The commissioner may make reasonable rules and regulations necessary to effect the purposes of this chapter."

## C. THE OFIS RULES

The OFIS rules on insurance scoring, Mich Admin Code, R 500.2151 through 500.2155, provide:

> Rule 1. As used in these rules:
>
> (1) "Insurance score" means a number, rating, or grouping of risks that is based in whole or in part on credit information for the purposes of predicting the future loss exposure of an individual applicant or insured.
>
> (2) "Personal insurance" means private passenger automobile, homeowners, motorcycle, boat, personal watercraft, snowmobile, recreational vehicle, mobile-homeowners and non-commercial dwelling fire insurance policies. "Personal insurance" only includes policies underwritten on an individual or group basis for personal, family, or household use. [Mich Admin Code, R 500.2151.]
>
> Rule 2. These rules apply to personal insurance. [Mich Admin Code, R 500.2152.]
>
> Rule 3.
>
> (1) For new or renewal policies effective on and after July 1, 2005, an insurer in the conduct of its business or activities shall not use an insurance score as a rating factor.

---

[18] MCL 500.210 refers to former provisions of the Insurance Code that have now been repealed and replaced by the APA. Any reference to these provisions is deemed to be a reference to the APA. MCL 24.312.

(2) For new and renewal policies effective on and after July 1, 2005, an insurer in the conduct of its business or activities shall not use an insurance score as a basis to refuse to insure, refuse to continue to insure, or limit coverage available. [Mich Admin Code, R 500.2153.]

Rule 4.

(1) For new and renewal policies effective on or after July 1, 2005, an insurer shall adjust base rates in the following manner:

(a) Calculate the sum of earned premium at current rate level for the period January 1, 2004 through December 31, 2004.

(b) Calculate the sum of earned premium at current rate level with all insurance score discounts eliminated for the period January 1, 2004 through December 31, 2004.

(c) Reduce base rates by the factor created from the difference of the number 1 and the ratio of the amount of subdivision (a) to the amount of subdivision (b).

(2) The insurer shall file with the commissioner a certification that it has made the base rate adjustment and documentation describing the calculation of the base rates adjustment. The insurer shall file the certificate and documentation not later than May 1, 2005. [Mich Admin Code, R 500.2154.]

Rule 5. If an insurer fails to make the filing required under R 500.2154, in any proceeding challenging a related rate filing, then the insurer shall be subject to the presumption that the rate filing does not conform to rate standards. [Mich Admin Code, R 500.2155.]

## D. ANALYSIS

### i. INTRODUCTION

We conclude that the trial court properly held the OFIS rules invalid and unenforceable. Plaintiffs have demonstrated that the OFIS rules are not "within the matter covered by the enabling statute" as required by *Luttrell*, 421 Mich at 100, because insurance scoring is permissible under the Insurance Code. The record supports

18

plaintiffs' contention that insurance scoring may be used to establish a premium discount plan under Chapter 21. Insurance scores may also be used as a rating factor under Chapters 24 and 26, and defendant has failed to show that insurance scoring produces rates that are "unfairly discriminatory." The Commissioner has the authority to "promulgate rules and regulations" to "effectuate the purposes" of the Insurance Code and to "execute and enforce" its provisions. MCL 500.210. By enacting a total ban on insurance scoring, a practice that may be employed in a manner that is consistent with the Insurance Code, defendant exceeded her authority as the OFIS Commissioner.[19]

## ii. INSURANCE SCORING MAY BE USED TO ESTABLISH A PREMIUM DISCOUNT PLAN

Chapter 21 of the Insurance Code, MCL 500.2110a,[20] permits insurers to establish and maintain a premium discount plan using factors in addition to those specifically enumerated in MCL 500.2111, provided that the plan "is consistent with the purposes of

---

[19] The dissent states that the proper inquiry is not whether insurance scoring is permissible under the Insurance Code, but "whether rules banning the use of insurance scoring in setting insurance rates are within the matters covered by MCL 500.210." We question how the latter question can be answered without addressing the former. The Commissioner's authority to "execute and enforce" the provisions of the Insurance Code and to "effect [its] purposes" does not encompass the authority to rewrite the Insurance Code.

[20] MCL 500.2110a provides, in relevant part:

If uniformly applied to all its insureds, an insurer may establish and maintain a premium discount plan utilizing factors in addition to those permitted by section 2111 for insurance if the plan is consistent with the purposes of this act and reflects reasonably anticipated reductions in losses or expenses.

19

this act and reflects reasonably anticipated reductions in losses or expenses" and is uniformly applied to all the insurer's insureds.

The evidence establishes that a premium discount plan using insurance scoring may reflect reasonably anticipated reductions in losses or expenses on the part of the insurer employing the plan. Commissioner Fitzgerald's 2002 report concluded that

> [t]here exists a correlation between a person's insurance credit score and the likelihood that a claim will be filed. A thorough review of material submitted by ChoicePoint and by a number of companies demonstrates that better scores are connected to fewer claims and thus lower expenses than are the scores of persons with weaker credit histories. [Fitzgerald Report, *supra* at 22.]

In addition, several affidavits submitted by plaintiffs in the lower court record indicate a correlation between insurance scores and risk of loss. The affidavit of Morrall Claramunt, Executive Vice President and Secretary of plaintiff Frankenmuth Mutual Insurance Company, is representative. Claramunt stated in his affidavit that "Frankenmuth's experience shows that there is a clear and direct correlation between insurance scores and risk. Among our insureds, people with higher insurance scores are better risks." Claramunt stated that 91 percent of Frankenmuth's homeowners insurance customers and 89 percent of its automobile insurance customers receive insurance score discounts on their premiums. He estimated that 68.1 percent of Frankenmuth's homeowners insurance customers and 43.5 percent of its automobile insurance customers would experience premium increases as a result of the OFIS rules' ban on insurance scoring. Claramunt stated that "[t]hese premiums do not reflect a shift in corresponding risk of loss, but result in low-risk insureds subsidizing the insurance rates of high-risk

20

insureds." Proposed Intervenors' Appendix to Brief in Support of Motion for Preliminary Injunction, March 29, 2005, included in Plaintiffs Appendix in Docket No. 137407, p 116a. Affidavits of representatives of plaintiffs Farm Bureau Insurance Company, Progressive Michigan Insurance Company, Hastings Mutual Insurance Company, and Citizens Insurance Company of America similarly stated that those companies' experiences show a correlation between insurance scores and risk, and that the OFIS rules would result in lower-risk insureds subsidizing the rates of higher-risk insureds. See *id*. at 115a-152a.

Evidence in the administrative record also supports the conclusion that there is a correlation between insurance scores and risk of loss. For example, according to a statement submitted by Allstate Insurance Company, "the use of credit information is the most powerful predictor of losses to be developed in the past 30 years." Plaintiffs' Appendix in Docket No. 137400, p 200b. A chart submitted by Allstate Insurance Company based on Michigan data demonstrates that "insureds . . . that have superior insurance scores have [a] corresponding superior loss cost experience," and that insureds with the lowest insurance scores have "over 50% more claims paid" than insureds with the highest insurance scores. *Id.* at 203b. In addition, Michigan data submitted by Farm Bureau Insurance of Michigan "clearly suggests that, as a group, insureds with better insurance scores have better loss experience." *Id.* at 98b. The personal auto product manager for Progressive Michigan Insurance Company testified that "[o]ur data shows that credit information is highly predictive of loss . . . ." *Id.* at 105b. A comprehensive study conducted by EPIC Actuaries, LLC, concluded that "the propensity for loss

21

decreases as [the] insurance score increases." *Id.* at 59b. Finally, the Virginia Bureau of Insurance Study concluded that "there is a concrete statistical correlation between insurance scores based on credit bureau data and the likelihood of an individual filing an insurance claim." *Id.* at 132b.[21]

---

[21] Contrary to the dissent's contention, these studies cannot be summarily dismissed on the basis that they used "univariate analysis" and "analyzed data from states other than Michigan." The EPIC study cited above, "[u]sing *multivariate* analysis techniques to adjust the data for interrelationships between risk factors, [concluded that] insurance scores were found to be correlated with the propensity for loss." *Id.* at 30b (emphasis added). This same study also explained that "graphs for *each state* . . . exhibit strikingly similar patterns of decreasing claim frequencies with increasing insurance scores to the pattern observed in the countrywide data." *Id.* at 33b (emphasis added). In addition, the Allstate chart mentioned above includes Michigan-only data, *id.* at 203b, and Farm Bureau's data cited above are also exclusively from Michigan. *Id.* at 102b. Finally, the dissent incorrectly asserts that none of these studies includes data on Michigan home policies. Allstate provided a chart that includes data on Michigan home policies and this chart shows that insureds with the highest insurance scores also incur "far less loss costs" than do insureds with lower insurance scores. *Id.* at 203b.

Concerning the EPIC study, the dissent further argues, relying on the 2004 OFIS report to JCAR, *supra* at 20, 24, that the actual Michigan data in the EPIC study undermine the authors' assertion that the graphs for each state exhibit similar patterns of decreasing claims frequencies with increasing insurance scores. Michael J. Miller, one of the authors of the EPIC study, has specifically responded to these claims. In an April 12, 2005 affidavit, Miller states that "[t]he OFIS is wrong" in claiming "that the conclusions in our June 2003 report are 'totally contradicted' by the Michigan data in our sample." Miller explains that the EPIC study was based on data from six automobile coverages: bodily injury liability, property damage liability, medical payments, personal injury protection, comprehensive, and collision. The study's conclusions were based on the results from all six coverages, but because of the sheer size of the report, the authors chose to exhibit in the report results from only one of the six coverages: property damage liability. While that was a good choice for 49 states, it was not an ideal choice for Michigan because of Michigan's unique no-fault law, which causes the frequency of property damage claims in Michigan to be about one-fifth of the rate countrywide. "The relatively few claims resulted in substantial random variations in the data, making the correlation between credit-based insurance scores and losses less obvious in the Michigan data for this coverage." Miller continues:

22

Defendant acknowledges that "there is no dispute that [MCL 500.2110a] authorizes a premium discount plan based on factors that correlate to expected reductions in losses or expenses. For example, discounts may be based on maintaining fire extinguishers in the home because it is expected that the presence of fire extinguishers will be associated with reduced losses." Defendant's Brief in Docket No. 137400, p 18. Defendant argues, however, that MCL 500.2110a does not permit a premium discount plan using insurance scoring "because insurance scoring is not associated with anticipated reductions in overall losses. In other words, insurers do not expect their overall losses to change whether or not they have an insurance-scoring discount plan." *Id*. (emphasis deleted). In support of this conclusion, defendant states that "insurers admitted" at the public hearings and as part of the public comment process "that doing away with insurance scoring would not change overall premiums." *Id*. Defendant quotes testimony from a spokesperson for State Farm Insurance Company: "Insurance scoring

Attached to this affidavit are five exhibits of the Michigan data from our June 2003 study. Each of the five Michigan coverages is represented by a separate graph. *These exhibits show for Michigan exactly what we found from the countrywide data: credit-based insurance scores are correlated with the propensity for an insurance claim, or loss*.

Given this strong correlation which is evident in Michigan and across the country, it would be unreasonable to assume that there is no relationship between credit-based insurance scores and auto insurance claims. The knowledge that credit-based insurance scores are related and predictive of insurance losses, means that rates established without reflection of credit scores will be inadequate for some insureds, excessive for other insureds, and unfairly discriminatory for all. [Plaintiffs' Appendix in Docket No. 137407 at 169a-170a (emphasis added).]

23

does not change the total amount of premium collected by the insurance companies and a ban of its use will not change the total amount either." *Id*. at 19.

From insurers' testimony that the OFIS rules banning insurance scoring would not result in an industry-wide reduction in premiums for insurance consumers,[22] defendant argues that insurers do not expect a reduction in "overall losses" to be associated with offering discounts for insurance scores. Defendant's argument misreads MCL 500.2110a, which says nothing about *overall* losses or expenses. MCL 500.2110a allows "an insurer" to establish "*a plan*" "if *the plan* . . . reflects reasonably anticipated reductions in losses or expenses." The plain meaning of this provision is that an insurer may establish a plan that it reasonably anticipates will reduce *its own* losses or expenses. It is unclear how an insurer would "reasonably anticipate[]" the effect of its premium discount plan on *industry-wide* losses or expenses.[23] Individual insurers *do*, of course,

---

[22] The State Farm representative defendant quotes was testifying in opposition to the OFIS rules. She was voicing State Farm's "strong disagree[ment]" with the claim that the OFIS rules would result in rate reductions for consumers. The representative testified that the rules would not result in "across the board thirty to forty percent premium reductions" and that "the amount paid by each individual consumer would be less reflective of their individual risk." As a result of the OFIS rules, "[p]olicyholders with higher insurance scores, and also less likelihood for future losses, will lose this discount and experience an increase in insurance premiums. They will be subsidizing those policyholders with lower insurance scores and higher chances of future losses." Defendant's Appendix in Docket No. 137400, p 112a-113a.

[23] The dissent correctly observes that "nowhere does defendant specifically contend that a discount plan is permissible under MCL 500.2110a only if it reflects anticipated reductions in losses or expenses across the entire insurance industry." Given defendant's reliance on testimony that clearly refers to the effect of insurance scoring on industry-wide insurance premiums, however, it appears that defendant's repeated

24

anticipate reductions in their own losses or expenses to result from the use of premium discount plans using insurance scoring. Specifically, they anticipate that insurance score discounts will enable them to attract and retain more low-risk customers by offering these customers lower rates. Plaintiffs have demonstrated a clear correlation between insurance scores and risk of loss, as already discussed. Therefore, they have established that a discount plan that enables an insurer to attract and retain more lower risk insureds "reflects reasonably anticipated reductions in losses or expenses for that insurer."[24]

Defendant's attempts to distinguish the use of insurance scores to establish a premium discount plan from the use of safety devices to establish such a plan fails to acknowledge that MCL 500.2111 already permits insurers to take into account "[s]ecurity and safety devices," including "smoke detectors" and "similar, related devices." MCL 500.2111(7)(b). Similarly, for automobile insurance, the statute permits "[u]se of a safety belt" to be used as a classification factor. MCL 500.21112(b)(*iv*). The Legislature added

---

references to "overall" premiums and "overall" losses are to industry-wide premiums and losses.

Moreover, defendant's effort to distinguish discounts for safety devices from discounts for good insurance scores appears to be premised on an assumption that the former discounts reduce losses on an industry-wide basis in a way the latter do not.

[24] The illustration provided by defendant (Defendant's Brief in Docket No. 137400, p 19-20) and adopted by the dissent does not "show[]," *id*. at 20, that insurance scores do not reflect reasonably anticipated losses or expenses; it merely assumes that an insurer's expected losses are $900 both before and after instituting a premium discount plan using insurance scoring. See *id*. ("To illustrate, assume that an insurer's actuaries conclude it needs to collect $900 in premium[s] to pay for its expected losses and expenses. . . . If the insurer initiates insurance scoring, it still needs to collect $900 because there is no evidence that insurance scoring affects the overall expected losses.")

25

MCL 500.2110a in 1997 to permit insurers to offer discounts on the basis of factors "in addition to those permitted by" MCL 500.2111. Defendant's effort to distinguish discounts for safety devices from discounts for higher insurance scores also fails to recognize that offering discounts for high insurance scores, like offering discounts for safety devices, allows insurers to attract insureds who present less risk (because they currently have safety devices or high insurance scores), and may provide future incentives for insureds to acquire safety devices or improve their insurance scores, and thus become statistically less risky customers. There is little difference between providing a discount for anti-lock brakes, for example, and providing a discount based on high insurance scores.[25] Discounts for anti-lock brakes are offered because they reduce

---

[25] In 2002, the then-Insurance Commissioner concluded that "if responsible behavior in general leads to the predictive link between credit histories and insurance losses, as insureds change behavior to obtain better insurance credit scores they may experience fewer losses." Fitzgerald Report, *supra* at 19. Therefore, even if, as defendant and the dissent contend, offering a discount to insureds with high insurance scores will not change the total premiums that insurers collect from their insureds *today*, just as with offering a discount to insureds with anti-lock brakes will not change such premiums *today*, offering such discounts may well reduce premiums in the future, as insureds learn what is required in order to reduce their own risks of loss, and, thereby, to also reduce their premiums. The dissent complains that "setting premium rates on the basis of insurance scoring simply reallocates the amount each insured pays based on its insurance score." However, the dissent overlooks the obvious fact that setting premium rates without considering insurance scoring *also* reallocates the amount insureds pay—in that instance, by requiring those who have been the most successful in meeting their financial obligations to subsidize those who have not, despite clear evidence that those in the former group do pose less of a risk of loss than those in the latter group.

As our analysis of the evidence in the preceding pages ought to make clear, we do not "presuppose[]" that insurance scoring is predictive of loss, as the dissent contends. Having concluded that plaintiffs have established a correlation between insurance scores and risk of loss, our purpose here is to (1) explain that MCL 500.2110a does not require a

26

the risk of loss, and discounts for high insurance scores are offered because they reduce the risk of loss. The more insureds there are with anti-lock brakes, the lower the risk of overall loss. Likewise, the more insureds there are with high insurance scores, the lower the risk of overall loss.

Defendant also argues that a premium discount plan using insurance scoring is impermissible under MCL 500.2110a because it ignores one of the express purposes of the Insurance Code: to make insurance available and affordable for everyone.[26] Defendant contends that, unless a premium discount plan reduces overall losses and reduces premiums for some policyholders without a corresponding increase in premiums for others industry-wide, it is inconsistent with the Legislature's purpose of making insurance available and affordable for everyone. These assertions about the overarching purposes of the insurance code are unavailing because, as discussed above, MCL 500.2110a expressly permits "*an* insurer" to establish "*a plan*" "if *the plan* . . . reflects reasonably anticipated reductions in losses or expenses."

Moreover, in his 2002 report, Commissioner Fitzgerald concluded that "insurance credit scoring contributes to the continued availability and affordability of automobile

---

premium discount plan to result in an "overall reduction in premiums," and (2) point out that offering discounts to insureds with high insurance scores may nonetheless reduce premiums in the future, just as offering discounts for safety devices may reduce premiums in the future.

[26] See MCL 500.100, which states that the Insurance Code is "[a]n act to . . . provide for the continued availability and affordability of automobile insurance and homeowners insurance in this state and to facilitate the purchase of that insurance by all residents of this state at fair and reasonable rates . . . ."

and homeowners insurance." Fitzgerald Report, *supra* at 17. There is also evidence in the administrative record that the majority of Michigan residents will see an increase in their insurance premiums *if insurance scoring is prohibited.* See Plaintiffs' Appendix in Docket No. 137400 at 98b, 106b, 169b, 194b, and 204b. If so, the prohibition of insurance scoring would obviously make insurance less affordable for many Michigan policyholders. The availability of insurance would be diminished because insurers would no longer be able to use "the most powerful predictor of losses" to determine rates. *Id.* at 200b. A number of insurers submitted testimony indicating that competition in Michigan would likely decrease because of the increased risks associated with a less sophisticated and precise classification structure, thereby decreasing the availability of insurance. *Id.* at 100b and 177b. For example, one insurer opined:

> If Michigan joins the distinct minority of states rejecting [insurance scoring] and depriving carriers of this highly predictive rating tool, [we] fear[] that many national carriers will decline to write in this state. Declining carrier presence will translate to fewer options for consumers and ultimately, higher rates. [*Id*. at 177b.]

The Federal Trade Commission (FTC) also explained in a report to Congress that using insurance scoring is of broad benefit:

> Insurance companies have a strong economic incentive to try to predict risk as accurately as possible. In a competitive market for insurance in which all firms have access to the same information about risk, competition for customers will force insurance companies to offer the lowest rates that cover the expected cost of each policy sold. If an insurance company is able to predict risk better than its competitors, it can identify consumers who currently are paying more than they should based on the risk they pose, and target those consumers by offering them a slightly lower price. Thus, developing and using better risk prediction

28

methods is an important form of competition among insurance companies.[27]

It seems unlikely that more available and more affordable insurance will result from decreased competition among insurers any more than such a market phenomenon would likely result in the increased availability or affordability of any other product or service. That is, it is the *prohibition*, not the *allowance*, of insurance scoring that will, in fact, make insurance both less available and less affordable to Michigan residents. It is noteworthy in this regard that after the Maryland legislature banned the use of insurance scoring for homeowners insurance, rates increased as much as 20 percent for homeowner policyholders, and at least one insurer indicated that about 75 percent of its homeowner policyholders incurred rate increases.[28]

Even defendant does not appear to dispute that while banning insurance scoring would lower insurance premiums for insurance customers with lower credit scores, it would *raise* premiums for many others with higher insurance scores who are now receiving discounts on the basis of those scores. It is difficult to see how offering discounts to some insureds on the basis of good insurance scores is inconsistent with the Insurance Code's general purpose of availability and affordability of insurance for all

---

[27] See Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p 8, available at <http://www.ftc.gov/os/2007/07/P044804FACTA_Report_Credit-Based_Insurance_Scores.pdf> (accessed June 23, 2010).

[28] Statement of Westfield Group to the Commissioner, dated July 29, 2004, attached to letter received from plaintiff following oral arguments.

consumers. Defendant has not shown that insurance scoring cannot be used to establish a premium discount plan that complies with MCL 500.2110a.

### iii. INSURANCE SCORING DOES NOT PRODUCE RATES THAT ARE UNFAIRLY DISCRIMINATORY

For the reasons explained above, insurance scoring may be used to establish a premium discount plan under Chapter 21. For insurance under Chapters 24 and 26, insurers must give due consideration to "past and prospective loss experience" and "all other relevant factors . . . ." MCL 500.2403(1)(a); MCL 500.2603(1)(a). "Risks may be grouped by classifications for the establishment of rates and minimum premiums," and "rating plans may measure any differences among risks that may have a probable effect upon losses or expenses . . . . " MCL 500.2403(1)(c); MCL 500.2603(1)(c). "Rates shall not be excessive, inadequate, or unfairly discriminatory." MCL 500.2403(1)(d); MCL 500.2603(1)(d).

Thus, under Chapters 24 and 26, insurers may generally establish any rating plan that "measures any differences among risks that may have a probable effect upon losses or expenses." As discussed above, the experience of the insurance industry, as established in the lower court record, demonstrates a correlation between insurance scores and risk of loss. Thus, just as insurance scoring may be used to establish a premium discount plan under Chapter 21, the use of insurance scoring as part of a rating plan is consistent with Chapter 24 and 26. All three chapters, however, prohibit rates that are "excessive, inadequate, or unfairly discriminatory." MCL 500.2109(1)(a); MCL 500.2403(1)(d); MCL 500.2603(1)(d).

Defendant argues that insurance scoring is contrary to the Insurance Code because it produces rates that are unfairly discriminatory. As noted, Chapters 21, 24, and 26 all provide that "[r]ates shall not be . . . unfairly discriminatory." MCL 500.2109(1)(a); MCL 500.2403(1)(d); MCL 500.2603(1)(d). Chapters 21, 24, and 26 define "unfairly discriminatory" in a nearly identical fashion:

> A rate for a coverage is unfairly discriminatory in relation to another rate for the same coverage if the differential between the rates is not reasonably justified by differences in losses, expenses, or both, or by differences in the uncertainty of loss, for the individuals or risks to which the rates apply. A reasonable justification shall be supported by a reasonable classification system; by sound actuarial principles when applicable; and by actual and credible loss and expense statistics or, in the case of new coverages and classifications, by reasonably anticipated loss and expense experience. A rate is not unfairly discriminatory because it reflects differences in expenses for individuals or risks with similar anticipated losses, or because it reflects differences in losses for individuals or risks with similar expenses. [MCL 500.2109(1)(c); see also MCL 500.2403(1)(d); MCL 500.2603(1)(d).][29]

An existing OFIS rule defines "reasonable classification system" as

> a system designed to group individuals or risks with similar characteristics into rating classifications which are likely to identify significant differences in mean anticipated losses or expenses, or both, between the groups, as determined by sound actuarial principles and by actual and credible loss and expense statistics or, in the case of new coverages or classifications, by reasonably anticipated loss and expense experience. [Mich Admin Code, R 500.1505(3).]

---

[29] MCL 500.2403(1)(d) and MCL 500.2603(1)(d) are nearly identical, except that they add a sentence at the end of the definition: "Rates are not unfairly discriminatory if they are averaged broadly among persons insured on a group, franchise, blanket policy, or similar basis."

Defendant and the dissent argue that insurance scoring is not a reasonable classification system because credit reports are unreliable and their use therefore results in misclassification of policyholders. Significantly, however, although the Commissioner also regulates the state banking and finance industries, the Commissioner has taken no action to curtail the use of credit reports in these industries. Indeed, the state of Michigan, including the Commissioner's own office, employs credit reports to make thousands of decisions each year that affect Michigan residents. In 2009 alone, the state spent over $250,000 of taxpayer dollars to obtain thousands of credit reports.[30] Indeed, by requiring the Commissioner and other state agencies to obtain credit reports, the Legislature has effectively determined that credit reports are reliable. See, e.g., MCL 493.137(4)(b)(*i*) and MCL 493.163(1)(a)(*ii*).

In support of its argument that credit reports are inaccurate, defendant primarily relies on a 2003 report by the United States General Accounting Office (GAO). The report is entitled "Limited Information Exists on Extent of Credit Report Errors and Their Implications for Consumers."[31] As the title suggests, the GAO study detailed in the report essentially found that too little information existed to draw any conclusions about

---

[30] Contract No. 071b6200274, On-Line Credit Reporting Services for the Department of Labor & Economic Growth, available at <http://www.michigan.gov/documents/buymichiganfirst/6200274_257338_7.pdf> (accessed June 23, 2010).

[31] GAO, Statement for the Record Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, Consumer Credit, Limited Information Exists on Extent of Credit Report Errors and Their Implications for Consumers (July 31, 2003). Available at <http://www.gao.gov/new.items/d031036t.pdf> (accessed June 23, 2010).

the accuracy of credit reports. The GAO Report Highlights explain that "[i]nformation on the frequency, type, and cause of credit report errors is limited to the point that a comprehensive assessment of overall credit report accuracy using currently available information is not possible." It further notes that "[i]ndustry officials and studies indicated that credit report errors could either help or hurt individual consumers depending on the nature of the error and the consumer's personal circumstances." Defendant cites three studies discussed in the report that raised concerns about the accuracy of credit reports: one by the Consumer Federation of America and National Credit Reporting Association, one by the U.S. Public Interest Research Group, and a survey conducted by Consumers Union and published by Consumer Reports. GAO Report, *supra* at 4-6. With respect to these studies, the GAO report concluded:

> We cannot determine the frequency of errors in credit reports based on the Consumer Federation of America, U.S. PIRG, and Consumers Union studies. Two of the studies did not use a statistically representative methodology because they examined only the credit files of their employees who verified the accuracy of the information, and it was not clear if the sampling methodology in the third study was statistically projectable. Moreover, all three studies counted any inaccuracy as an error regardless of potential impact. Similarly, the studies used varying definitions in identifying errors, and provided sometimes obscure explanations of how they carried out their work. Because of this, the findings may not represent the total population of credit reports maintained by the [consumer reporting agencies, or] CRAs. Moreover, none of these groups developed their findings in consultation with members of the credit reporting industry, who, according to a [Consumer Data Industry Association][32] representative, could have verified or refuted some of the claimed errors.

---

[32] The Consumer Data Industry Association is a trade association for the consumer reporting agencies.

Beyond these limitations, a CDIA official stated that these studies misrepresented the frequency of errors because they assessed missing information as an error. According to CRA officials errors of omission may be mitigated in certain instances because certain lenders tend to use merged credit report files in making lending decisions . . . . [*Id*. at 9.]

The materials defendant cites for the proposition that credit reports are unreliable are inconclusive at best. Moreover, there is evidence in the administrative record that most of the "errors" in credit reports are minor ones, such as misspelled street names, that have little or no substantive effect on the actual insurance scoring itself. Plaintiffs' Appendix in Docket No. 137400 at 118b-119b, 206b. See also the written testimony of Allstate Insurance Company, indicating that its "internal data," derived from the more than 43.5 million credit reports it ordered in 2001, 2002, 2003, in connection with the use of insurance scoring models, "indicat[e] a minute amount of error." *Id*. at 206b.[33] Any

---

[33] Further, the Fair Credit Reporting Act requires furnishers to carefully evaluate the accuracy and completeness of account information before it is furnished to any CRA. 15 USC 1681s-2. The FTC advises consumers that credit reports are a predictor of risk of loss and may affect their insurance premiums. FTC Facts for Consumers, <http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm> (accessed on June 23, 2010). Consumers have many opportunities to obtain all of their credit report file information, without charge, from every CRA to see whether the information is inaccurate or incomplete. 15 USC 1681j(a)(1)(A). Every time a Michigan consumer is denied any credit, insurance, or other benefit based in whole or in part on credit report information (including insurance scores), the consumer receives an adverse action notice informing him of the right to obtain a free copy of his credit report. 15 USC 1681m(a)(3). Even if the consumer obtains the applied-for insurance, he will still receive an adverse action notice informing him of the right to obtain a free credit report if he is charged a premium that is higher than it would have been had the insurance score not been considered. *Safeco Ins Co of America v Geico Ins Co*, 551 US 47, 64; 127 S Ct 2201; 167 L Ed 1045 (2007) (". . . Congress meant to require notice and prompt a challenge by the consumer only when the consumer would gain something if the challenge succeeded."). With this information, the consumer may obtain his credit report

"unreliability" resulting from minor errors that have little or no effect on insurance scoring is irrelevant for purposes of the Insurance Code. In order for any unreliability to produce rates that are unfairly discriminatory within the meaning of the Insurance Code, the unreliability would have to result in a "differential between the rates" that "is not reasonably justified by differences in losses, expenses, or both, or by differences in the uncertainty of loss, for the individuals or risks to which the rates apply." MCL 500.2109(1)(c); see also MCL 500.2403(1)(d); MCL 500.2603(1)(d). A rate is not unfairly discriminatory if there is a "reasonable justification" for the differential in rates "supported by a reasonable classification system." *Id*. Here, plaintiffs have demonstrated that insurance scoring may be used to establish a "reasonable classification system." Plaintiffs' "actual and credible loss statistics" indicate that insurance scoring may be used to establish a "system designed to group individuals or risks with similar characteristics which are likely to identify significant differences in mean anticipated losses or expenses, or both, between the groups." Mich Admin Code, R 500.1505(3). For example, an affidavit of Dawn Elzinga, Director of Property Casualty Actuarial and an employee of plaintiff Farm Bureau, summarizes data collected by Farm Bureau reflecting its losses since Farm Bureau began using insurance scoring premium discounts

---

and determine whether any inaccurate information caused the adverse action. If the consumer disputes the accuracy or completeness of his information through the CRA that furnished the credit report, the CRA must conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate, and within 30 days the CRA must delete any information that is determined to be inaccurate or cannot be verified. 15 USC 1681i(a)(1)(A) and (a)(5)(A).

for personal automobile insurance on July 1, 2000. From 2000 through 2004, insureds with the highest insurance scores (those receiving the largest discounts) filed 20 claims for every 100 cars insured, while insureds with the lowest insurance scores (those who were not receiving any discount) filed 28 claims for every 100 cars insured. See Plaintiff's Appendix in Docket No. 137407 at 124a-125a. Similarly, plaintiff Hastings submitted to the trial court actuarial analyses it commissioned in 2004 in order to comply with OFIS filing requirements. The analyses demonstrate a direct, linear relationship between insurance scores and risk for both automobile and homeowners policies. According to an affidavit of Keith E. Jandahl, Vice President of Underwriting for Hastings, these analyses were filed with OFIS, which never challenged the filing. See *id*. at 140a, 143a, and 145a.[34]

Accordingly, we reject defendant's argument that the use of insurance scoring inherently violates the Insurance Code's prohibition on rates that are "unfairly discriminatory." Because the Commissioner has no authority under the Insurance Code to ban a practice that the code permits, the OFIS rules exceed the scope of the

---

[34] In response to the dissent's argument that "the circuit court record provides little that undermines defendant's factual findings made at the public hearings," we note that, in addition to the affidavits cited above, Commissioner Fitzgerald's 2002 report, which found a correlation between insurance scores and risk of loss, Fitzgerald Report, *supra* at 17, is part of the circuit court record.

Commissioner's rulemaking authority under the Insurance Code.  Under *Luttrell*, 421 Mich at 100, the OFIS rules are invalid.[35]

## IV.  CONCLUSION

The Commissioner has the authority to insure that insurers' practices comply with the Insurance Code.  Nothing about the practice of insurance scoring, however, amounts to a violation of the Insurance Code per se.  The Commissioner exceeded her authority by enacting a total ban on a practice that the Insurance Code permits.  Accordingly, we vacate the judgment of the Court of Appeals and reinstate the trial court's order declaring the OFIS rules invalid and permanently enjoining their enforcement.


WEAVER, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, J.

---

[35] In this Court's order granting the applications for leave to appeal, we also directed the parties to address whether the OFIS rules "violated plaintiffs' due process rights" and "were arbitrary and capricious."  *Ins Institute*, 483 Mich at 1000.  Because we resolve this case on statutory grounds, we do not reach the constitutional issue.  We need not address whether the rules are arbitrary and capricious because we conclude that they are not "within the matter covered by the enabling statute."  *Luttrell*, 421 Mich at 100 (citation and quotation marks omitted).

STATE OF MICHIGAN

SUPREME COURT

INSURANCE INSTITUTE OF
MICHIGAN, HASTINGS MUTUAL
INSURANCE COMPANY, FARM
BUREAU GENERAL INSURANCE
COMPANY, FRANKENMUTH
CASUALTY INSURANCE, WALTER
STAFFORD, JR., and MICHAEL FLOHR,

        Plaintiffs-Appellees,

and

MICHIGAN INSURANCE COALITION
and CITIZENS INSURANCE COMPANY
OF AMERICA,

        Intervening Plaintiffs-
        Appellees,

v                                                                  No. 137400

COMMISSIONER, FINANCIAL &
INSURANCE SERVICES, DEPARTMENT
OF LABOR & ECONOMIC GROWTH,

        Defendant-Appellant.

_____

INSURANCE INSTITUTE OF
MICHIGAN, HASTINGS MUTUAL
INSURANCE COMPANY, FARM
BUREAU GENERAL INSURANCE
COMPANY, FRANKENMUTH
CASUALTY INSURANCE, WALTER
STAFFORD, JR., and MICHAEL FLOHR,

        Plaintiffs-Appellants,

and

MICHIGAN INSURANCE COALITION
and CITIZENS INSURANCE COMPANY
OF AMERICA,

        Intervening Plaintiffs-
        Appellants,

v                                        No. 137407

COMMISSIONER, FINANCIAL &
INSURANCE SERVICES, DEPARTMENT
OF LABOR & ECONOMIC GROWTH,

        Defendant-Appellee.

_____

CORRIGAN, J. (*concurring*).

I write separately to explain that I would overrule *Mich Ass'n of Home Builders v Mich Dep't of Labor & Economic Growth Dir*, 481 Mich 496; 750 NW2d 593 (2008), because I believe that it was wrongly decided and I see no reason not to correct the error now.

In *Home Builders*, we held in a memorandum opinion that "judicial review of an administrative rule, which by definition constitutes a non-contested case, is limited to the administrative record and that the administrative record may not be expanded by a remand to the administrative agency." *Id*. at 498. Noting the definition of "contested case," MCL 24.203(3), we reasoned that "[a] non-contested case would therefore encompass administrative determinations that do not fall within the definition of a contested case." *Id*. We concluded that, because the issue before us involved a "rule," which is not a contested case, MCL 24.207(f), "the review of an administrative rule is categorized as involving a non-contested case." *Home Builders*, 481 Mich at 498.

We then reviewed the procedure applicable to a contested case under chapter 6 of the Administrative Procedures Act (APA), MCL 24.201 *et seq.*, including its express provision for expansion of the record. *Home Builders*, 481 Mich at 499-501. We concluded that "[t]he absence of a similar provision for non-contested cases strongly suggests the limited scope of judicial review in these cases under the legal maxim *expressio unius est exclusio alterius*." *Id*. at 500-501. "Accordingly, we hold that judicial review of an administrative rule is limited to the administrative record and that the administrative record may not be expanded by a remand to the administrative agency." *Id*. at 501.

Professor Don LeDuc subsequently criticized our decision in *Home Builders* as "fail[ing] to recognize [] that all administrative actions or outcomes covered by the Michigan APA that are not contested cases are not the same." LeDuc, Michigan Administrative Law § 4:35 (2009 Supp), p 30. According to Professor LeDuc,

> [t]he correct analysis should have been premised on the definition of rule and the nature of the rulemaking process, and it should have proceeded then to discussing the role of the rulemaking record in judicial review and in the determination of the validity of rules. Because a rule under the Michigan structure does not result from an evidentiary record, discussions about adding evidence are irrelevant. . . .
>
> The Court concluded that the lower court erred when it remanded the matter to the agency so that it could add to the record or explain its decision. That conclusion was correct, but virtually all [of] its analysis was wrong. [*Id*.]

Although we generally adhere to the principle of *stare decisis*, we should reexamine a precedent where legitimate questions have been raised about its correctness. *Robinson v Detroit*, 462 Mich 439, 463-464; 613 NW2d 307 (2000). If we determine that

3

a prior case was wrongly decided, we also "examine the effects of overruling, including most importantly the effect on reliance interests and whether overruling would work an undue hardship because of that reliance." *Id*. at 466. "As to the reliance interest, the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Id*.

Professor LeDuc correctly analyzed the flaw in *Home Builders*. "Non-contested case" is not a designation that appears in the APA, and, as discussed above, the record created during a contested case proceeding is different from the record of a public hearing held during the rulemaking process. We wrongly based our analysis in *Home Builders* on the absence in the APA of a provision for adding evidence in a "non-contested case." I see no reason not to correct our error. Our decision in *Home Builders* has not become "so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Robinson*, 462 Mich at 466. Only one Court of Appeals case—this one—has cited our decision in *Home Builders*.

Accordingly, I would overrule *Home Builders* and hold that the trial court's review of the OFIS rules was not limited to the administrative record.

WEAVER and YOUNG, JJ., concurred with CORRIGAN, J.

4

STATE OF MICHIGAN

SUPREME COURT


INSURANCE INSTITUTE OF
MICHIGAN, HASTINGS MUTUAL
INSURANCE COMPANY, FARM
BUREAU GENERAL INSURANCE
COMPANY, FRANKENMUTH
CASUALTY INSURANCE, WALTER
STAFFORD, JR., and MICHAEL FLOHR,

          Plaintiffs-Appellees,

and

MICHIGAN INSURANCE COALITION
and CITIZENS INSURANCE COMPANY
OF AMERICA,

          Intervening Plaintiffs-
          Appellees,

v                                       No. 137400

COMMISSIONER, FINANCIAL &
INSURANCE SERVICES, DEPARTMENT
OF LABOR & ECONOMIC GROWTH,

          Defendant-Appellant.

_____

INSURANCE INSTITUTE OF
MICHIGAN, HASTINGS MUTUAL
INSURANCE COMPANY, FARM
BUREAU GENERAL INSURANCE
COMPANY, FRANKENMUTH
CASUALTY INSURANCE, WALTER
STAFFORD, JR., and MICHAEL FLOHR,

          Plaintiffs-Appellants,

and

MICHIGAN INSURANCE COALITION
and CITIZENS INSURANCE COMPANY
OF AMERICA,

        Intervening Plaintiffs-
        Appellants,

v                                     No. 137407

COMMISSIONER, FINANCIAL &
INSURANCE SERVICES, DEPARTMENT
OF LABOR & ECONOMIC GROWTH,

        Defendant-Appellee.

_____

KELLY, C.J. (*dissenting*).

I agree with the majority that the Court should reach the substantive issues in this case.[1] I respectfully dissent from its conclusion regarding the validity of the rules promulgated by defendant that prohibit insurers from classifying insureds on the basis of their credit records (the OFIS rules). Also, of particular concern to me is the majority's harmless-error analysis. It is seriously flawed and sets a dangerous precedent for the future.

THE STANDARD OF REVIEW

In *Luttrell v Dep't of Corrections*,[2] this Court adopted a three-pronged test for analyzing the validity of an administrative agency's rules:

_____

[1] I disagree with the majority's waiver analysis. I reach the substantive issues because, like the majority, I have determined that, if there are procedural errors, they do not affect my conclusion on the substantive issues.

[2] *Luttrell v Dep't of Corrections*, 421 Mich 93; 365 NW2d 74 (1984).

2

Where an agency is empowered to make rules, courts employ a three-fold test to determine the validity of the rules it promulgates: (1) whether the rule is within the matter covered by the enabling statute; (2) if so, whether it complies with the underlying legislative intent; and (3) if it meets the first two requirements, when *[sic]* it is neither arbitrary nor capricious.[3]

In *In re Complaint of Rovas against SBC Michigan*, we held that an administrative agency's interpretation of statutes is entitled to "respectful consideration" and "should not be overruled without cogent reasons."[4]

## THE MAJORITY'S CRITICAL ERRORS

In my view, the majority goes awry in at least five significant ways. First, it misapplies the applicable standards of review. Under the first prong of *Luttrell*, the proper inquiry is not whether "insurance scoring is permissible under the Insurance Code."[5] The Code says nothing about insurance scoring. The relevant inquiry is whether rules banning the use of insurance scoring in setting insurance rates are within the matters covered by MCL 500.210.[6]

---

[3] *Id.* at 100 (citation and quotation marks omitted).

[4] *In re Complaint of Rovas against SBC Michigan*, 482 Mich 90, 108; 754 NW2d 259 (2008).

[5] *Ante* at 18; MCL 500.100 *et seq.*

[6] Unlike the majority, I do see a difference between this inquiry and its phrasing of the question. Under MCL 500.210, the Commissioner has the authority to promulgate rules and regulations to effectuate the purposes of the Insurance Code. In my view, the power to enact rules to "effectuate the purposes" of the Insurance Code provides a broader grant of authority than the power simply to inquire whether the Code permits a particular practice. Because the majority hinges its conclusion on this prong of the *Luttrell* test, its precise application is imperative.

Second, by considering and rejecting each argument offered in support of the OFIS rules, the majority improperly shifts the burden of proof to defendant.[7] Third, the majority fails to give "respectful consideration" to defendant's interpretation of the applicable statutes as *In re Rovas Complaint* requires.[8]

Fourth, the majority errs by not confining its review of the record to conform to its "harmless error" analysis. The majority holds that "even if the trial court erred by not limiting its review to the administrative record, the error was harmless because there is ample evidence *in that record* to support the trial court's conclusion that insurance scoring is permissible under the Insurance Code."[9] Yet the majority subsequently expands its review by referring to evidence outside that record.

The majority has it backwards. If the circuit court erred by creating its own evidentiary record, its conclusion must be wholly supportable on appeal by evidence in the administrative record. For an error to be considered harmless, the conclusion reached in the case must be supportable notwithstanding the alleged error.[10] If the majority

---

As the majority observes, I do question whether the Insurance Code authorizes insurance scoring. However, I do so as part of the second prong of my *Luttrell* analysis, ascertaining whether the OFIS rules comply with legislative intent.

[7] For example, the majority offers no authority to support its conclusion that the Commissioner exceeded her authority by "enacting a total ban on a practice that the Insurance Code permits." *Ante* at 37.

[8] *In re Rovas Complaint*, 482 Mich at 108.

[9] *Ante* at 13 (emphasis added).

[10] For an error to be "harmless," it cannot "affect a party's substantive rights or the case's outcome." Black's Law Dictionary (8th ed), p 582.

4

deems it necessary, as evidenced by its analysis, to examine both the administrative record and the circuit court record to support its conclusion, the error cannot be "harmless."[11]

After conducting a proper "harmless error" analysis, I reach the opposite conclusion from the majority. Any procedural error was harmless because the evidence in both the administrative record and the circuit court record failed to establish that the OFIS rules are invalid. Thus, my inquiry gives plaintiffs the benefit of every doubt and examines the evidence in both records. The result is that, if a procedural error occurred, it was harmless. By expanding the scope of its review, the majority fails to accord defendant the same treatment, thereby making its harmless-error analysis erroneous.

Fifth and finally, the majority's overly broad review of the record goes beyond even the administrative and circuit court records. It relies on sources outside any record provided to this Court.[12]

These errors are crucial to the outcome of the case.[13] As the discussion of the

---

[11] The majority seems to miss this point. *Ante* at 13 n 16. It can be paraphrased as follows: The majority says it can reach its result based on X (the administrative record), even if Y (the circuit court record) was erroneously admitted. Yet the majority refuses to rely solely on X, despite its assertion that X is sufficient to support its conclusion. Instead, it relies—and relies *primarily*—on Y, the record that it admits may have been erroneously admitted. If the majority refuses to rely solely on X to reach its conclusion, on what basis can it logically assert that X provides sufficient evidence for its conclusion?

[12] See, e.g., *ante* at 34 n 30.

[13] A careful reading of the majority opinion reveals that, of all the evidence relied on, only a small fraction is part of the administrative record. To the extent that the

5

merits of plaintiffs' claims demonstrates, much conflicting evidence exists on whether insurance scoring is predictive of loss. The majority appears willing to overrule defendant's decision simply because it disagrees with it. However, when the proper level of deference is applied, it is irrelevant whether the majority would decide the issue differently. Rather, after examining the conflicting evidence, one can only conclude that defendant did not exceed her authority by promulgating the rules banning the practice.

*HOME BUILDERS*

Under *Home Builders*, the circuit court indisputably erred by creating and considering an evidentiary record outside of what was created during the rulemaking process. However, despite the fact that the circuit court impermissibly expanded the record in contravention of *Home Builders*, I do not believe that the error is outcome determinative. Under the proper standard of review, neither the circuit court record nor the administrative record supports the trial court's conclusion that the OFIS rules are invalid.

After declining to review the administrative record and instead constructing its own record, the circuit court concluded that the OFIS rules were invalid. It did so on the

---

majority does rely on the administrative record, it cites it primarily for conclusory statements by plaintiffs, not actual data. *Ante* at 21 ("'[T]he use of credit information is the most powerful predictor of losses to be developed in the past 30 years.'"); *ante* at 21 ("[O]ur data shows that credit information is highly predictive of loss . . . ."). This stands in stark contrast to the short shrift the majority gives to even attempting to accurately summarize defendant's arguments. See *ante* at 24 n 23 ("it appears that defendant's repeated references to 'overall' premiums and 'overall' losses are to industry-wide premiums and losses.").

6

basis of its independent factual conclusion that insurance scores accurately reflect differences in risk. I believe that, by reaching its own factual conclusions and failing to consider the administrative record at all, the circuit court erred.

We long ago held that "courts accord due deference to administrative expertise and [may] not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views."[14] Although this holding arose in the context of judicial review of quasi-judicial administrative decisions, I see no basis for limiting it to such cases. Judicial review of agency actions implicates significant questions about the separation of powers.[15] The Court of Appeals in *Home Builders* cited ample authority in summarizing this point:

> The federal courts generally limit judicial review to the administrative record already in existence, rather than permitting either review de novo or trial de novo. *Florida Power & Light Co v Lorion*, 470 US 729, 743-744; 105 S Ct 1598; 84 L Ed 2d 643 (1985); *Camp v Pitts*, 411 US 138, 142; 93 S Ct 1241; 36 L Ed 2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Nat'l Treasury Employees Union v Horner*, 272 US App DC 81, 89; 854 F2d 490 (1988) ("Stated most simply, our task is to determine . . . whether [the agency] considered the relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record."); *Norwich Eaton Pharmaceuticals, Inc v Bowen*, 808 F2d 486, 489 (CA 6, 1987). For example, in *Florida Power*, *supra* at 744, the United States Supreme Court stated:
>
> > "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing

---

[14] *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc*, 393 Mich 116, 124; 223 NW2d 283 (1974).

[15] See, e.g., *In re Rovas Complaint*, 482 Mich at 97-99.

court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. *The reviewing court is not generally empowered to conduct a* de novo *inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.*"[16]

Moreover, agency actions taken in a judicial or quasi-judicial capacity, as contrasted with those taken in a quasi-legislative capacity, are subject to a heightened standard of review.[17] Thus, quasi-legislative agency actions are afforded greater deference.

---

[16] *Michigan Ass'n of Home Builders v Dep't of Labor & Economic Growth Dir*, 276 Mich App 467, 476; 741 NW2d 531 (2007) (emphasis in original), vacated in part on other grounds in *Home Builders*, 481 Mich at 501.

[17] Compare the deferential *Luttrell* standard for review of quasi-legislative administrative agency actions, *supra* at 2-3, with the standard of review for judicial and quasi-judicial actions. The latter must be "'authorized by law'" and its factual findings "'supported by competent, material and substantial evidence on the whole record.'" *Viculin v Dep't of Civil Serv*, 386 Mich 375, 384; 192 NW2d 449 (1971), quoting Const 1963, art 6, § 28.

Moreover, MCL 24.306, which governs judicial review involving judicial and quasi-judicial actions, allows for reversal of an agency's decision when a decision or order of the agency is "any of the following":

(a) In violation of the constitution or a statute.

(b) In excess of the statutory authority or jurisdiction of the agency.

(c) Made upon unlawful procedure resulting in material prejudice to a party.

(d) Not supported by competent, material and substantial evidence on the whole record.

(e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.

Accordingly, the factual findings on which an administrative agency's rule is based certainly must be considered in reviewing the validity of that rule. To allow a court to make factual findings based solely on a record made in the court would allow the judiciary to substitute its own judgment for that of the agency. Moreover, it would allow the courts to usurp the authority that the Legislature granted to administrative agencies.

### THE VALIDITY OF THE OFIS RULES

The first prong of the *Luttrell* analysis requires plaintiffs to show that the OFIS rules banning insurance scoring are not "within the matter covered" by the Insurance Code.[18] In that way, plaintiffs are given the burden of showing that a total ban on insurance scoring is inconsistent with the Code. Because I conclude that the OFIS rules are within the matter covered by the Insurance Code, I conclude that plaintiffs have not met their burden. Plaintiffs cannot demonstrate either that the rules are incompatible with the underlying legislative intent or that they are arbitrary and capricious.

### "WITHIN THE MATTER COVERED BY THE ENABLING STATUTE"

When courts apply the first prong of the *Luttrell* test, the most relevant authorities are the enabling statutes of the Insurance Code. MCL 500.210 defines the scope of the Insurance Commissioner's regulatory powers. Section 210 provides that

> [t]he commissioner shall promulgate rules and regulations in addition to those now specifically provided for by statute as he may deem necessary to

---

(f) Affected by other substantial and material error of law.

[18] *Luttrell*, 421 Mich at 100, quoting *Chesapeake & Ohio R Co v Pub Serv Comm*, 59 Mich App 88, 98-99; 228 NW2d 843 (1975).

9

effectuate the purposes and to execute and enforce the provisions of the insurance laws of this state in accordance with the provisions of Act No. 88 of the Public Acts of 1943, as amended, being sections 24.71 to 24.80 of the Compiled Laws of 1948, and subject to Act No. 197 of the Public Acts of 1952, as amended, being sections 24.101 to 24.110 of the Compiled Laws of 1948.[19]

MCL 500.210 delegates broad discretionary authority to the Commissioner to promulgate rules "as he may deem necessary" to enforce insurance laws and "effectuate the purposes" of the Insurance Code. Even Judge ZAHRA's opinion, which would have held the OFIS rules invalid, conceded that "[i]n the broadest sense, the rules under review do not offend the first prong of the *Luttrell* standard."[20] Moreover, as Judge WHITE noted,[21] the OFIS rules were promulgated in compliance with the prescribed procedures in the Administrative Procedures Act (APA).[22]

I agree that, on their face, the OFIS rules are within the broad discretionary authority that the Legislature bestowed on defendant to "effectuate the purposes" of the Insurance Code. The majority reaches the opposite conclusion because, as noted previously, it merely asks whether insurance scoring is "permissible" under the Insurance Code.[23]

---

[19] See also MCL 500.2484 ("The commissioner may make reasonable rules and regulations necessary to effect the purposes of this chapter."); MCL 500.2674 (same).

[20] *Ins Institute*, 280 Mich App at 375 (opinion of ZAHRA, J.).

[21] *Id.* at 358 (opinion of WHITE, P.J.).

[22] MCL 24.201 *et seq.*

[23] See *ante* at 18.

10

COMPLIANCE WITH THE UNDERLYING LEGISLATIVE INTENT

The title of the Insurance Code provides that the purpose of the Code is "to provide for the continued availability and affordability of automobile insurance and homeowners insurance in this state and to facilitate the purchase of that insurance by all residents of this state at fair and reasonable rates . . . ."[24] Thus, the OFIS rules cannot satisfy this prong of the *Luttrell* standard if they are contrary to that intent. Ascertaining legislative intent necessitates a close examination of the statutory language of the applicable statutes. I would hold that the OFIS rules do not comply with the Legislature's intent if Chapters 21, 24, and 26 of the Insurance Code authorize insurance scoring.

CHAPTER 21

It is undisputed that insurance scoring is not included within the enumerated permissible rating factors in MCL 500.2111. Therefore, using insurance scoring to set insurance rates is only permissible under Chapter 21 if it is a permissible "premium discount plan" under MCL 500.2110a. Affording the required "respectful consideration" to defendant's interpretation of MCL 500.2110a, I agree that setting rates based on insurance scoring does not constitute a "premium discount plan."

At the public hearings held before the OFIS rules were adopted, insurers conceded that eliminating insurance scoring would not change the total premiums that they collect

_____

[24] 1956 PA 218.

from their insureds.[25]  It follows that the proposed "discount plan" based on insurance scoring does not reflect a belief on the part of the insurers that insurance scoring will reduce its overall losses.  If it did, the insurers would surely be forced to increase their premiums to reflect the expected increase in losses that would be incurred once their "discount plans" had been disallowed.

Rather, setting premium rates on the basis of insurance scoring simply reallocates the amount each insured pays on the basis of its insurance score.  Defendant uses an example in which an insurer must collect $900 in premiums to pay for its expected losses and expenses.  Dividing these losses evenly across Class A, Class B, and Class C, each class of insureds would be charged $300.  However, using insurance scoring to predict losses, the insurer charges its highest scoring insureds (Class A) a $200 premium.  The insurer charges its less favored policyholders a $300 premium, and its lowest scoring policyholders a $400 premium.  The insurer still collects $900 in premiums.[26]  I agree with Judge WHITE that this classification scheme constitutes an unapproved rating factor

---

[25] Despite this concession, the majority feels free to conclude that "insurers do, of course, anticipate reductions in their own losses or expenses to result from the use of premium discount plans using insurance scoring." *Ante* at 24-25 (emphasis omitted).

[26] The majority's discussion of industry-wide losses and expenses is a red herring, as this illustration demonstrates.  Defendant's brief frequently refers to "overall" losses.  However, nowhere does defendant specifically contend that a discount plan is permissible under MCL 500.2110a only if it reflects anticipated reductions in losses or expenses across the entire insurance industry, nor does my analysis impose such a requirement.

rather than a discount.[27]   Therefore, I see no cogent reasons to overrule defendant's interpretation of MCL 500.2110a.[28]

## CHAPTER 24 AND CHAPTER 26

Chapter 24 and Chapter 26 of the Insurance Code allow insurers greater authority in setting premiums than does Chapter 21.[29]   MCL 500.2403(1)[30] and

---

Rather, I interpret MCL 500.2110a as the majority does, as requiring that a discount plan reasonably anticipate a reduction in losses or expenses to each insurer. Initially, I note that an insurer cannot "reasonably" anticipate a reduction in losses or expenses based on a discount plan premised on insurance scoring if credit reports are unreliable. See *infra* at 16-20.

Moreover, defendant's example illustrates that insurance rates that are set on the basis of insurance scoring will not reduce the premiums that an individual insurer collects. Instead, such rates will reallocate the dollar amount of the premium paid by each insured. I fail to see how such rates can reflect "reasonably anticipated reductions in losses or expenses" if the insurer continues to collect the same amount in total premiums.

[27] *Ins Institute*, 280 Mich App at 361.

[28] *In re Rovas Complaint*, 482 Mich at 108.

[29] MCL 500.2426 and MCL 500.2626 both state that no "rating plan" that is filed pursuant to the requirements of their respective chapters shall be disapproved if the rates thereby produced meet the requirements of the chapter.

[30] MCL 500.2403(1) provides in part:

(c) Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans that measure variations in hazards, expense provisions, or both. The rating plans may measure any differences among risks that may have a probable effect upon losses or expenses as provided for in subdivision (a).

(d) Rates shall not be excessive, inadequate, or unfairly discriminatory. A rate shall not be held to be excessive unless the rate is unreasonably high for the insurance coverage provided and a reasonable

MCL 500.2603(1)[31] provide the limitation on setting rates at issue here.

Plaintiffs argue that under MCL 500.2426 and MCL 500.2626, defendant may not disapprove rates that are based on insurance scores because insurance scoring is actuarially sound. Defendant counters that insurance scoring is not a "reasonable classification system" under MCL 500.2403(1)(d) and MCL 500.2603(1)(d). A "reasonable classification system" is defined as

> a system designed to group individuals or risks with similar characteristics into rating classifications which are likely to identify significant differences in mean anticipated losses or expenses, or both, between the groups, as determined by sound actuarial principles and by actual and credible loss and expense statistics or, in the case of new coverages or classifications, by reasonably anticipated loss and expense experience.[32]

---

> degree of competition does not exist with respect to the classification, kind, or type of risks to which the rate is applicable. . . . A rate for a coverage is unfairly discriminatory in relation to another rate for the same coverage, if the differential between the rates is not reasonably justified by differences in losses, expenses, or both, or by differences in the uncertainty of loss for the individuals or risks to which the rates apply. A reasonable justification shall be supported by a reasonable classification system; by sound actuarial principles when applicable; and by actual and credible loss and expense statistics or, in the case of new coverages and classifications, by reasonably anticipated loss and expense experience. A rate is not unfairly discriminatory because the rate reflects differences in expenses for individuals or risks with similar anticipated losses, or because the rate reflects differences in losses for individuals or risks with similar expenses. Rates are not unfairly discriminatory if they are averaged broadly among persons insured on a group, franchise, blanket policy, or similar basis.

[31] The pertinent parts of MCL 500.2603 are identical to the portions of MCL 500.2403 cited in note 30 of this opinion.

[32] Mich Admin Code, R 500.1505(3).

14

Thus, defendant claims that rates set based on insurance scores are "unfairly discriminatory" because they are not "likely to identify significant differences in mean anticipated losses or expenses."

An examination of both the circuit court record and the administrative record reveals the reasonableness of defendant's conclusion that rates based on insurance scores are unfairly discriminatory. First, the accuracy of credit reports, on which insurance scores are based, is unclear. The GAO report cited by the majority concluded that "a comprehensive assessment of overall credit report accuracy using currently available information is not possible."[33] As defendant noted, the evidence on this point is inconclusive.[34]

The majority appears to concede that the reliability of credit reports is subject to question. Yet it proceeds by effectively requiring defendant, rather than plaintiffs, to show that "the unreliability [in credit scores] would have to result in a 'differential between the rates' that 'is not reasonably justified . . . .'"[35]

I would conclude the contrary and hold that the uncertainty surrounding the accuracy of credit reports is evidence per se that a classification system based on those

[33] United States General Accounting Office (GAO), Statement for the Record Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, Consumer Credit, Limited Information Exists on Extent of Credit Report Errors and Their Implications for Consumers (July 31, 2003). Available at: <http://www.gao.gov/new.items/d031036t.pdf> (accessed June 24, 2010).

[34] OFIS Report to JCAR (October 1, 2004), p 23 (observing the "wide divergence in opinion" regarding the accuracy of credit reports).

[35] *Ante* at 35.

15

reports is unreasonable. It should be plaintiffs' burden to rebut this conclusion by producing evidence that such a classification is reasonable. To do so, plaintiffs would need to demonstrate that classifying persons on the basis of insurance scores is "likely to identify significant differences in mean anticipated losses or expenses."[36]

The record simply does not establish that credit scores correlate with the risk of loss in a way that makes insurance scoring a "reasonable classification system" under MCL 500.2403(1)(d) and MCL 500.2603(1)(d). Defendant reasonably rejected some of the studies submitted at the public hearings in opposition to the OFIS rules because they used "univariate analysis"[37] and analyzed data from states other than Michigan.[38] The only study not conducted by plaintiffs that included data on Michigan automobile policies, which plaintiffs cited often as supporting their position, showed "a total lack of

---

[36] In my view, if insurance scores are based on credit reports containing inaccurate information, they cannot be "likely to identify significant differences in mean anticipated losses." However, I do not further address this issue because I conclude that plaintiffs have not shown a correlation between credit scores and risk of loss.

[37] A "univariate analysis" is an analysis that takes only one factor or variable into consideration. See *Anmol's Dictionary of Statistics* (2005); *Oxford Dictionary of Statistical Terms* (2003).

Other authors have criticized the use of univariate analysis in some of the studies cited in the administrative record. See Cheng-Sheng Peter Wu and James Guszcza, *Does Credit Score Really Explain Insurance Losses? Multivariate Analysis from a Data Mining Point of View*, <http://casualtyactuaries.com/pubs/forum/03wforum/03wf113. pdf> (accessed June 24, 2010), p 9 ("Unfortunately, univariate statistical studies such as Tillinghast's do not always tell the whole story.").

[38] OFIS Report to JCAR, *supra* at 20.

16

correlation."[39] Moreover, defendant noted that "the agency is not aware of any study at

all . . . that includes data on Michigan home policies."[40] The majority entirely ignores

---

[39] *Id.* The study that included data from Michigan was Michael Miller and Richard Smith, *The Relationship of Credit-Based Insurance Scores to Private Passenger Automobile Insurance Loss Propensity*, available at <http://www.progressive.com/shop/ EPIC-CreditScores.pdf> (accessed June 24, 2010).

The Michigan-specific data, which showed no correlation between insurance scores and frequency in filing of insurance claims, is Appendix Q of this study. It is available at <http://www.michigan.gov/documents/Attachment_5_-_EPIC_Charts_- _MI_113194_7.pdf> (accessed June 24, 2010).

The majority correctly observes that, in the body of its report, the authors asserted that the "graphs for each state . . . exhibit strikingly similar patterns of decreasing claim frequencies with increasing insurance scores to the pattern observed in the countrywide data." *Ante* at 22 n 21 (emphasis deleted), quoting Plaintiffs' Appendix in Docket No. 137400, at 33b. However, this assertion is undermined by the actual data, which show that claim frequency in Michigan based on insurance scoring ranged from only 0.5% to 0.8%. While the claimants with the highest insurance score did have the lowest rate of claims (0.5%), claimants with the third highest insurance score had one of the highest rates of claims (0.8%). Therefore, one is hard-pressed to square the actual data with the authors' conclusion that the majority quotes.

The majority excuses this disparity by citing Michael Miller's affidavit, in which Miller attempts to explain it away. *Ante* at 22 n 21. The affidavit claims that "the relatively few claims resulted in substantial random variations in the data, making the correlation between credit-based insurance scores and losses less obvious in the Michigan data for this coverage." The existence of an excuse for why the Michigan data makes the connection between credit scoring and losses "less obvious" does nothing to justify the majority's reliance on it.

Finally, Miller attached five graphs to his affidavit with Michigan-specific data purporting to buttress the EPIC study's conclusion. Again, the majority takes the author's stated conclusion at face value. However, as with the data from the EPIC study, most of the actual numbers do not show a strong correlation between credit scoring and propensity for loss. Instead, the portion of the graphs charting Michigan-specific data often deviate significantly from that pattern and do not demonstrate the "strong correlation" that the majority posits.

[40] OFIS Report to JCAR, *supra* at p 20.

17

these findings and picks and chooses from among the available data to independently consider whether a classification system based on credit scores is reasonable.[41]

However, the circuit court record provides little that undermines defendant's factual findings made at the public hearings. Plaintiffs continued to rely heavily on the studies that defendant reasonably rejected. The new evidence introduced in the circuit court consisted primarily of affidavits from various insurance industry executives. These cite statistics that purportedly show a correlation between credit scores and risk. While generally supporting plaintiffs' position, the affidavits are insufficient to rebut defendant's conclusion that the use of insurance scoring to set rates is not a "reasonable classification system." The statistical data in the affidavits, like the studies in the

---

[41] The majority's response to this dissent on the substantive issues involved is unavailing because it presupposes the majority's ultimate conclusion: that insurance scoring is predictive of loss. *Ante* at 27, 26 n 24. Thus, its conclusions that "[d]iscounts for anti-lock brakes are offered because they reduce the risk of loss, and discounts for high insurance scores are offered because they reduce the risk of loss" do not advance its position. *Ante* at 26-27. Similarly, I see little value in speculating that offering discounts based on insurance scoring might lead sometime in the future to reductions in premiums. *Ante* at 27 n 25. Indeed, for defendant to rely on such speculation as a basis for formulating administrative rules is, in my view, erroneous.

Finally, the majority's contention that "setting premium rates without considering insurance scoring also reallocates the amount insureds pay" is similarly unavailing. *Ante* at 28 n 24 (emphasis omitted). Plaintiffs contend that the use of insurance scoring is permissible because it constitutes a "discount plan" under MCL 500.2110a. However, as previously noted, if insurance scoring simply reallocates rates, rather than resulting in an overall reduction in premiums, it is an unapproved rating factor, not a discount plan.

By contrast, no party has contended that setting premium rates without considering insurance scoring constitutes a "discount plan" within the meaning of MCL 500.2110a. That system simply reallocates the amount insureds pay based on permissible rating factors laid out in the relevant statutes.

18

administrative record, are based on a univariate analysis. For reasons cited previously, it was not unreasonable for defendant to reject this analysis.[42] Finally, I do not address the majority's discussion of sources outside the administrative and circuit court records because the majority improperly relies on them.[43] Reference to statutes that are not applicable to this case may be appropriate when discerning the proper interpretation of a statute; however, it is not warranted simply as a means of bolstering the evidence that is on the record.

As with Chapter 21, defendant's interpretation of the applicable statutory provisions in Chapters 24 and 26 is entitled to "respectful consideration" under *In re Rovas Complaint*. Because setting rates using insurance scoring is not clearly permissible under any chapter, I conclude that the OFIS rules do not violate the legislative intent behind the Insurance Code.

ARBITRARY AND CAPRICIOUS

The majority concludes that it need not decide whether the OFIS rules are arbitrary and capricious because "they are not 'within the matter covered by the enabling statute.'"[44] Given that I disagree with the majority's conclusion on the latter point, I am

---

[42] See note 37 of this opinion.

[43] *Ante* at 34 & n 30 (citing sources outside the existing record, including a contract between the state and Credit Technologies, Inc, and references to credit scores in MCL 493.137(4)(b)(*i*) and MCL 493.163(1)(a)(*ii*) as "evidence" that credit reports are reliable).

[44] *Ante* at 39 n 36.

compelled to also address the former issue regarding whether the OFIS rules are arbitrary and capricious.

"A rule is not arbitrary or capricious if it is rationally related to the purpose of the enabling act."[45] For the reasons stated previously, I conclude that the OFIS rules are rationally related to the purpose of the Insurance Code: to provide for continued availability and affordability of insurance in this state and to facilitate the purchase of that insurance by all residents at fair and reasonable rates.

DUE PROCESS

Plaintiffs also argue that the OFIS rules are invalid because they deprive them of due process. They argue that the rules invalidate existing insurance rates without a contested case hearing and an opportunity for judicial review. I disagree.

The rules do not invalidate existing insurance rates. They are prospective only and apply solely to new and renewal policies issued after their effective date. Moreover, the rules are not self-enforcing; they do not invalidate rates. Defendant acknowledges that, after the rules take effect, insurers are entitled to notice and an opportunity for a hearing before rates may be invalidated. If an insurer's rate filing uses insurance scoring, that rate filing will be disapproved as a violation of the OFIS rules. Plaintiffs' argument conflates their right to a contested case hearing before a rate filing may be invalidated into a right to such a hearing before new rules may be promulgated. To create such a

---

[45] *Blank v Dep't of Corrections*, 462 Mich 103, 128; 611 NW2d 530 (2000) (opinion by KELLY, J.), citing *Dykstra v Dep't of Natural Resources*, 198 Mich App 482, 491; 499 NW2d 367 (1993).

20

right would cripple an agency's authority to promulgate rules and be duplicative of the procedural protections already present in the APA.

Finally, plaintiffs contend that any rate hearing will be a meaningless exercise because the outcome will be predetermined and the filing will be disapproved. This argument is disingenuous because plaintiffs chose to file this action for declaratory judgment attacking the *facial* validity of the rules. To accept plaintiffs' due process argument would be to ignore that plaintiffs chose this forum, rather than individual contested case hearings, to challenge the OFIS rules. Moreover, this argument could just as easily be raised by an insurer that sets rates on the basis of impermissible factors such as race or gender; however, it is inconceivable that such rates would be allowed simply because the result of the contested case hearing was predetermined.

## CONCLUSION

I agree with the majority's decision to reach the substantive issues in this case. However, I dissent from its conclusion that the Insurance Commissioner exceeded her rulemaking authority under *Luttrell v Dep't of Corrections*.

I would hold that the OFIS rules are valid and enforceable. Therefore, I would affirm the Court of Appeals judgment vacating the circuit court's order granting a permanent injunction and declaring defendant's rules illegal, unenforceable, and void.

CAVANAGH and HATHAWAY, JJ., concurred with KELLY, C.J.

21